UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-322 (TSC) |
| v. : | |
| : | |
| BRIAN LEO KELLY, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Brian Leo Kelly has pleaded guilty to two Class B misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Kelly to 14 days of incarceration on Count One and 36 months of probation on Count Two. The government also requests that this Court impose 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

I.   **Introduction**

Defendant Brian Leo Kelly, a 57 year-old small business owner from Fairfax Station, Virginia, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count,

1

threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

The government's recommendation is supported by Kelly's decisions to: (1) enter the U.S. Capitol building, despite the numerous warnings signs that he was not permitted to be there; (2) remain inside the Capitol for a considerable period of time – roughly 36 minutes – while ignoring police efforts to clear the building; and (3) widely film the chaos of the riot on his cellphone, treating the unfolding events as a spectacle. After pleading guilty in this case in September 2024, Kelly violated a provision of the plea agreement. Although the plea agreement obligated him to participate in an interview with investigators, Kelly failed to respond to the government's numerous attempts to schedule the interview.

The Court must also consider that Kelly's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Kelly's crime support a sentence of 14 days of incarceration and 36 months of probation.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF 21.

*Kelly's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Kelly traveled from his home in Northern Virginia to participate in the "Stop the Steal" rally near the Ellipse. After attending the rally, Kelly walked with the crowd in the direction of the Capitol building, which he approached from the West Front.

Kelly made his way to the Capitol's Upper West Terrace. Around the time that he arrived at that location, police had already pushed some rioters out of the nearby Senate Wing Doors, and those doors had been temporarily secured. Rioters looked for new access points into the Capitol building, which they found at the Upper West Terrace Door. At approximately 2:34 p.m., as a handful of rioters exited the building, one rioter held the Upper West Terrace door open, allowing a new stream of other rioters to flow in from the outside. Kelly approached that door at 2:35 p.m. He did not hesitate as he entered, although it was obvious that members of the public were not allowed to use that door and that he was trespassing. As he entered the building, Kelly could hear blaring alarms and see that boxes lined the entranceway. ECF No. 21 at ¶ 9.



*Image 1: Kelly entered the Capitol building through a door that was clearly closed to the public at 2:35 p.m.*

Kelly walked up a flight of steps and entered the Rotunda at 2:36 p.m., where he remained for roughly two minutes. While in the Rotunda, Kelly filmed or took pictures on his cellphone. Kelly then moved to the adjacent Statuary Hall, where he continued to film events on his phone.



*Image 2: Kelly filmed throughout his roughly 36 minutes inside the Capitol building.*

Kelly then walked in the direction of the House of Representatives, until his passage was blocked when he encountered a large crowd that was held back by a line of police. Kelly joined

the crowd in chanting. After working his way to the midpoint of the crowd, he then turned around and walked back towards the Rotunda at approximately 2:48 p.m. ECF No. 21 at ¶ 10.


*Image 3: Kelly's passage towards the House Chamber was blocked by a police line.*

As he crossed through the Statuary Hall Connector and walked in the direction of the Rotunda, a haze from chemical irritants was so thick in the air that the people surrounding Kelly were visibly affected and had trouble breathing. Despite the clear signs that he was not permitted to be inside the Capitol building, Kelly did not quickly head for an exit, but instead wandered about, taking photos as souvenirs.


*Image 4: Kelly remained in the Capitol building despite the thick buildup of chemical irritants in the air.*

5



*Image 5: Even after being impacted by chemical irritants and seeing a police presence, Kelly remained inside the Capitol building.*

At roughly 2:57 p.m., Kelly advanced towards an exterior exit by the Rotunda doors. Instead of leaving, Kelly re-entered the Rotunda, where he remained until 3:07 p.m., when he again headed towards the doors. But at 3:09 p.m., he circled back again towards the Rotunda. Kelly finally left through the Rotunda Doors at 3:11 p.m. He was inside the Capitol building for roughly 36 minutes on January 6. ECF No. 21 at ¶ 11.

*The Charges and Plea Agreement*

On July 15, 2024, the United States charged Kelly by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) (Count One) and (a)(2) (Count Two) and 40 U.S.C. §§ 5104(e)(2)(D) (Count Three) & (e)(2)(G) (Count Four). On September 30, 2024, pursuant to a plea agreement, Kelly pleaded guilty to Counts Three and Four. By plea agreement, Kelly agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Kelly now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) & (G). As noted by the plea agreement and the U.S. Probation Office, Kelly faces up to six months of imprisonment and a fine of up to $5,000. Kelly must also pay restitution under the terms of his plea agreement.

6

*See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Kelly's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Kelly, the absence of violent or destructive acts is not a mitigating factor. Had Kelly engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Kelly's case was his decision to enter the Capitol building despite the clear and obvious signs that a riot was underway, and he was not permitted to be there. And having entered, despite hearing alarms, suffering from the direct effects of chemical irritants in the air, and observing police try and hold back the rioters, Kelly made the decision to continue to wander throughout the Capital building for more than half an hour. Accordingly, the

nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Kelly's History and Characteristics

As set forth in the PSR, Kelly's criminal history consists of a 1990 misdemeanor conviction for assault in 1990. In 1998, Kelly was charged with misdemeanor trespass. The disposition of that case is unknown. PSR ¶ 27. In 2015, Kelly was charged with misdemeanor assault and battery, and the case was dismissed. PSR ¶ 28.

Kelly owns two small businesses in Northern Virginia, including a heating oil business.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Kelly also weighs heavily in favor of some period of incarceration. Kelly participated in the riot inside the Capitol building for a long time – 36 minutes – despite knowing he was not permitted to be there. Kelly ignored the police presence and the chemical irritants that they deployed in efforts to disperse the crowd. He ignored the alarms. And despite multiple opportunities and incentives to exit the Capitol building earlier, Kelly clearly did not want to leave; he continued circling back towards the Rotunda to prolong his participation in the riot.

While Kelly quickly pleaded guilty in this case, since the entry of the guilty plea, Kelly has neither fully complied with the terms of the plea agreement nor been fully responsive to the Probation Office. The plea agreement requires Kelly to participate in an interview about his activities on January 6. ECF ¶ 3. To date, Kelly has not been responsive to efforts to schedule the interview. Moreover, as indicated in the PSR, Kelly has not complied with the probation office's

9

request for financial information. PSR ¶ 41.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Kelly based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Kelly has pleaded guilty to violating 40 U.S.C. §§ 5104(e)(2)(D) & (e)(2)(G). Theses offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The Court should consider the case of *U.S. v. Brandon and Stefanie Miller*, 21-cr-266 (TSC). Both defendants pleaded guilty to a single petty offense, 40 U.S.C. § 5104(e)(2)(G) and

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

this Court sentenced them to 20 and 14 days of incarceration, respectively. The Millers entered the Capitol building through a broken window; by contrast, Kelly entered through a side door that was clearly not open to the public. Whereas Brandon Miller broadcast his participation in the riot over Facebook live, Kelly was continuously on his cellphone filming the riot. Both Millers were active on social media after January 6, where they spoke with pride about taking part in the riot and expressed no remorse. In contrast, the government has not identified any social media in which Kelly glorified the events of January 6. The Millers and Kelly accepted the opportunity to plead guilty, acknowledge their criminal conduct, and promptly resolve their cases.

The Court should also consider the case of *U.S. v. Derek Sulenta*, 22-cr-340 (TSC). Both Sulenta and Kelly were inside the Capitol building for a comparable amount of time (40 minutes for Sulenta, 36 minutes for Kelly). After walking around the Crypt and taking photos, Sulenta entered a Senate conference room where he continued to take photos. Kelly, by contrast, walked around the area near the Rotunda, but also spent much of that time making videos and taking photos. Both Sulenta and Kelly have similar criminal histories—a single prior conviction for a misdemeanor offense. This Court sentenced Sulenta to 14 days of incarceration. The government believes a longer sentence is warranted for Kelly, who has not complied with all the terms of his plea agreement.

Another comparator case is *U.S. v. Victor Martinez*, 23-cr-39 (TSC). Martinez pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). He was inside the Capitol for over 50 minutes on January 6, including inside the Rotunda, where he observed physical skirmishes between rioters and police. Kelly was inside the Capitol building for less time, but similar to Martinez, treated the riot as a spectacle. Martinez joined the mob in singing and chanting in the Rotunda. Kelly joined a mob that chanted as it butted up against a police line near a hallway by the House Chamber. Both

11

Martinez and Kelly used their phones to record rioters' interactions and skirmishes with police. And like Martinez who delayed leaving the Rotunda even after witnessing violence, Kelly also delayed exiting the Rotunda, repeatedly circling back rather than leave. This Court sentenced Martinez to 14 days of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.     **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kelly must pay $500 in restitution, which reflects in part the role Kelly played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Kelly's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VI.  Fine

Kelly's convictions for violations of 40 U.S.C. §§ 5104(e)(2)(D) & (e)(2)(G) subject him to a statutory maximum fine of $5,000 per count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing

---

against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Kelly to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) ("it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Kelly has not shown an inability to pay. Pursuant to U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

### VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Kelly to 14 days of incarceration, three years of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Kelly's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Melanie Krebs-Pilotti*
MELANIE KREBS-PILOTTI
Trial Attorney- Antitrust Division
U.S. Attorney's Office – Washington, D.C.
Cal Bar No. 241484
(202) 870-7457
Melanie.krebs-pilotti2@usdoj.gov