IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:24CR-00322-001 |
| v. | Sentencing Date: January 17, 2025 |
| Brian Leo Kelly<br>Defendant | The Honorable Tanya S. Chutkan |

## POSITION OF THE DEFENSE
## WITH RESPECT TO SENTENCING FACTORS

In accordance with this Court's policy regarding sentencing and §6A1.2 of the United States Sentencing Guidelines and Policy Statements, Counsel for the Defendant hereby represents that he and his client have reviewed the Probation Officer's report and that we have no additions, corrections or objections.

Pursuant to §1B1.9 of the Guidelines, the offenses of conviction are petty offenses; as petty offenses, the Sentencing Guidelines do not apply and Supervised Release is not applicable. The statutory maximum punishment for each count is a term of imprisonment of up to six months, a fine of up to $5,000.00 and up to five years of probation.[1] Pursuant to our Plea Agreement, Mr. Kelly stands ready to pay $500.00 in restitution and a Special Assessment of $10 per count.

The parties have reserved argument on other sentencing matters. Where the Assistant United States Attorney has recommended a sentence of 14 days, we agree with the Probation Officer that a two-year term of probation is an appropriate sentence that

---

[1] Pursuant to the D.C. Circuit's holding in *United States v. James Little,* 78 F.4th 453 (D.C. Cir 2023), the Court can impose jail time *or* probation for a petty offense, but not both.

meets all the aims delineated by Congress in 18 U.S.C. §3553(a). In addition, we have financial information to present to the Court proving that Mr. Kelly has no ability to pay a fine and we ask that the Court assess only the $500.00 in restitution included in our Plea Agreement.

In presenting our argument, we take each of the §3553(a) factors in turn.

**The Nature and Circumstance of the Offense**

January 6, 2021 was one of the darkest days in our Nation's history. Spurred on by pent-up resentment of government and lies about stolen election results, thousands of Americans marched on the Capitol, pushed through the barricades, fought with officers and overran the building while both the House and Senate were meeting to certify the electoral results. Mr. Kelly arrived at the Upper West Terrace doorway after the doors had been forced open, and though he did not remove barricades, fight with police officers or destroy property to get there, he did enter the building and spend approximately half an hour walking in the Rotunda, chanting "U! S! A!" in the Statuary Hall Connector and taking photographs and videos of what and whom he saw as the stench of pepper spray hung in the air and the detritus of the mob and their acts of violence and vandalism lay strewn on the floor.

This is shameful behavior, and Mr. Kelly agreed at the time he entered his plea that he knew the gravity of the situation as soon as he entered the Rotunda – the Capitol is, as he told the Court, a beautiful and important place and everything he saw happening there was wrong. Mr. Kelly knew, as he told the Court, that the Capitol deserves much more reverence and respect than he demonstrated that day, and that his very presence contributed

to the misguided and momentary courage of those around him and their delusional belief that the crimes they were committing were somehow the righteous acts of patriots.

To assess Mr. Kelly's relative culpability, however, it is important to discuss everything he did *not* do on January 6. He was not one of the approximately 18 defendants who were part of a seditious conspiracy. He was not one of the approximately 608 charged with assaulting, resisting or impeding law enforcement during a civil disorder, let alone the approximately 174 defendants charged with assaulting a police officer and causing bodily injury or the approximately 180 defendants charged with entering the area with a dangerous or deadly weapon. He was not one of the approximately 259 defendants charged with seeking to obstruct Congress. He was not one of the approximately 91 defendants who destroyed government property or the approximately 68 who stole government property.[2]

In addition, as both the Probation Officer and the Assistant United States Attorney have written, once inside the building he did not approach, let alone enter, any non-public areas. He did not exhort others to commit any crime, let alone a violent one. And he did not, as so many others did, destroy evidence or obstruct justice after the fact.

Respectfully, we assert that Mr. Kelly is much more like the 433 defendants sentenced to terms of probation than the 667 given some period of incarceration. Using the government's sentencing recommendations as a proxy for relative culpability, their suggestion of a 14-day sentence places Mr. Kelly among the 200 least culpable defendants sentenced.[3] Though the January 6 cases are *sui generis* and there are no Guideline

---

[2] All of these statistics are taken from a report from the Department of Justice entitled "48 Months Since the Jan. 6 Attack on U.S. Capitol," dated January 6, 2025 and posted online at https://www.justice.gov/usao-dc/48-months-jan-6-attack-us-capitol

[3] The most current compilation of sentences imposed in January 6 cases, dated January 6, 2025 and available online at https://www.justice.gov/usao-dc/media/1331746/dl?inline, reflects that the government suggested probation in a limited number of cases (10 in total) decided in 2021, and probation with some period of home

3

provisions for the Court to consider, the available empirical data from more than 1100 sentencing orders and the collective experience of judges in this district suggest that Mr. Kelly should be sentenced to probation, not jail.

### The History and Characteristics of the Defendant

Mr. Kelly is a 62-year old Virginia resident whose own history and characteristics suggest that a term of probation is appropriate. As the Probation Officer noted, he is a widower without children, in good physical health given his age, with no reported mental health issues and no history of substance abuse. He has one prior criminal conviction, a misdemeanor from 1992. He has lived in Northern Virginia most of his life, and at the same address in Fairfax County since 2002. Though he dropped out of school at a young age, he was trained to become a welder and has built a business providing welding services and dumpsters for the disposal of rubble and construction debris. He is an expert operator of heavy construction equipment, such as backhoes and bulldozers. He has also made himself a trusted expert in the safe removal of diesel and home heating oil tanks.

Unfortunately, the same difficulties with memory and concentration that led him to leave school as a young man (and have contributed to his checkered history of prompt compliance with Pre-Trial Services' telephone checks) have led him into significant financial distress in recent years. He is, at the time of this writing, desperately trying to sell his home before losing it to creditors; documents related to his debt and the intentions of the successor trustee named by the Fairfax County Circuit Court are included with this memorandum under separate cover. Without his wife around to assist him with managing

---

confinement in an additional 72 cases. The next-lowest recommendation, 14 days in jail, was made in 118 other cases; 92 of those defendants received terms of probation rather than jail time.

his business, maintaining proper records and making prudent financial decisions, he has struggled to keep up with rises in interest rates that have nearly doubled the borrowing costs connected to both the line of credit his business depends on and the adjustable-rate mortgage on his home at a time when local construction work is limited. His most recent tax return, prepared for 2024 and submitted this week, is also included under separate cover for the Court's review. Counsel has committed to represent Mr. Kelly on these civil matters on a *pro bono* basis to ensure that he receives a fair price for his Fairfax home and can amicably restructure his business. We submit, respectfully, that his diminished income and significant financial hardships make him unable to pay a fine.

Counsel's personal experience with Mr. Kelly goes back more than 25 years, and includes many instances where Mr. Kelly has given freely to others from his own modest means, including giving housing, training, and paid work to many construction laborers who found themselves without work, transportation or housing. Counsel also knows Mr. Kelly to be a kind and generous spirit when it comes to housing and fostering dogs in need; at the current time he has only one rescue dog of his own because of his financial situation and his impending move from his Fairfax home, but he intends to help foster shelter dogs again once he settles at a new address.

Four years have passed since he entered the Capitol on January 6, 2021, and in that time his only contact with law enforcement is a single charge for operating a motor vehicle while holding a mobile phone, which was dismissed on the Commonwealth's motion.[4] In the 30 years before January 6, 2021, his only contacts with law enforcement were for minor traffic infractions and misdemeanor charges in 1998 and 2015 that were both dismissed on

---

[4] This case is discussed briefly in Paragraph 26 of the Pre-Sentence Report.

the Commonwealth's motion.[5] With the exception of that one terrible day four years ago, he has lived a quiet and law-abiding life; though the Sentencing Guidelines do not apply in this case, Mr. Kelly would have a Criminal History Category of I and all of the benefits of being a Zero-Point Offender if they did. *See USSG*, §§4A1.1 and 4C1.1. When presented with a plea offer, Mr. Kelly promptly agreed to the government's terms, accepted responsibility, and entered a guilty plea. His assistance with his own prosecution deserves some consideration, even without the three-point decrease pursuant to §3E1.1.

### The Need for the Sentence Imposed

Assessing the need for incarceration is always a difficult task that requires balancing many factors, most importantly the four provided by Congress in §3553(a)(2). Toward that end, we respectfully submit that there is no need for the Court to impose jail time. As discussed above, Mr. Kelly's conduct was shameful and serious, but when compared to the 1100 other January 6 defendants already sentenced, he is among the bottom 20% in relative culpability and more than 40% of all defendants have been sentenced to probation.

Promoting respect for the law is an important aim, but giving Mr. Kelly a harsher punishment than so many others whose conduct was similar or worse than his does not promote respect. Furthermore, with the upcoming changes in Department of Justice policy in the new Donald Trump administration, let alone the electorate's choice to return Mr. Trump to office, harsh treatment of January 6 misdemeanants does not seem to be an important public issue. As for a just punishment, the arguments presented above need not

---

[5] Counsel represented Mr. Kelly on all of these cases, including a petition to expunge the 1998 trespassing case; should the Court or the government wish to discuss the details, Counsel's memory of events is better than Mr. Kelly's.

the Commonwealth's motion.[5] With the exception of that one terrible day four years ago, he has lived a quiet and law-abiding life; though the Sentencing Guidelines do not apply in this case, Mr. Kelly would have a Criminal History Category of I and all of the benefits of being a Zero-Point Offender if they did. *See USSG*, §§4A1.1 and 4C1.1. When presented with a plea offer, Mr. Kelly promptly agreed to the government's terms, accepted responsibility, and entered a guilty plea. His assistance with his own prosecution deserves some consideration, even without the three-point decrease pursuant to §3E1.1.

### The Need for the Sentence Imposed

Assessing the need for incarceration is always a difficult task that requires balancing many factors, most importantly the four provided by Congress in §3553(a)(2). Toward that end, we respectfully submit that there is no need for the Court to impose jail time. As discussed above, Mr. Kelly's conduct was shameful and serious, but when compared to the 1100 other January 6 defendants already sentenced, he is among the bottom 20% in relative culpability and more than 40% of all defendants have been sentenced to probation.

Promoting respect for the law is an important aim, but giving Mr. Kelly a harsher punishment than so many others whose conduct was similar or worse than his does not promote respect. Furthermore, with the upcoming changes in Department of Justice policy in the new Donald Trump administration, let alone the electorate's choice to return Mr. Trump to office, harsh treatment of January 6 misdemeanants does not seem to be an important public issue. As for a just punishment, the arguments presented above need not

---

[5] Counsel represented Mr. Kelly on all of these cases, including a petition to expunge the 1998 trespassing case; should the Court or the government wish to discuss the details, Counsel's memory of events is better than Mr. Kelly's.

be repeated – a term of probation is the only sentence that compares fairly to those imposed on others, and a jail sentence will not promote respect for the law.

Furthermore, Mr. Kelly's law-abiding life during the four years following his offense and his law-abiding life during the 30 years before January 6 show that we know how he will perform on probation and that there is no need for jail time to provide deterrence or to protect the public from further crimes. His four years of clean living since the offense and the lengths he has taken to help those around him show the exact kind of rehabilitation the United States Supreme Court allowed a district court to consider in *Pepper v. United States,* 131 S. Ct. 1229 (2011). And as the Probation Officer noted in his recommendation, there is no educational or vocational training, medical care or other correctional treatment that the Bureau of Prisons could provide Mr. Kelly, let alone within the 14-day sentence suggested by the government.

### The Kinds of Sentences Available

As noted above, and as discussed in our Plea Agreement and the Pre-Sentence Report, the Court's options here are limited to a term of probation or a jail sentence, but not both. Given the greater need for supervision rather than a brief period of incarceration, the Probation Officer suggests that a two-year term of probation is appropriate, and we concur. The Court is also able to impose fines of up to $5,000.00 on each count, but given Mr. Kelly's current financial struggles we submit that he is unable to pay a fine.

Restitution is appropriate, and Mr. Kelly has agreed to pay $500.00 to the Architect of the Capitol. Despite his significant financial struggles, he is prepared to make that payment promptly.

### The Need to Avoid Unwarranted Sentence Disparities

Here, too, the record suggests that a term of probation should be imposed. The justifications for this fall into two categories – the probation terms imposed on over 400 of the 1100 defendants sentenced and Mr. Kelly's status among those given the lowest recommended sentences by the U.S. Attorney's Office, and the effect of Mr. Trump's promised pardons and significant changes in Department of Justice policy and practice.

The former has been discussed at length above; Mr. Kelly deserves to be treated like the 433 defendants sentenced to probation rather than the 677 sentenced to jail. The latter is a separate argument. Given the upcoming inauguration of Mr. Trump on January 20 and his promises to issue pardons and change Department of Justice policy and practice, we respectfully argue that imposing anything more than probation would create an unwarranted sentencing disparity. Where Mr. Kelly accepted responsibility promptly, entered a guilty plea before Election Day and stands before the Court for sentencing before January 20, those who have denied their guilt and delayed their prosecution or sentencing to some date after January 20 reasonably expect to receive no punishment at all.

According to the Department of Justice statistics cited above, as of this writing approximately 313 defendants have been arrested but have not yet entered a guilty plea or gone to trial, and approximately 170 additional defendants have entered pleas or been found guilty at trial but have not yet been sentenced; if Mr. Trump makes good on his repeated promises none of them will face any punishment, let alone jail time. To give Mr. Kelly a jail sentence, even a brief one, knowing that prosecutors may not be pursuing these cases in any meaningful way just a few days from now, would create an unwarranted sentencing disparity.

8

In addition, over 300 other defendants who have been arrested but not yet tried will likely see their cases be dismissed in the coming days. And if prior statements from the Department of Justice about how many people were at the Capitol that day are true, then there are hundreds – or possibly thousands – of other putative January 6 defendants who will never even be arrested. Many of the people who have not yet been sentenced, tried or even arrested yet are in that position in part because they have not accepted responsibility promptly as Mr. Kelly has, and their decisions to delay and deny and obstruct will pay off handsomely. To send him to jail now, when all of these others will face no punishment whatsoever simply because their cases will not be completed before Inauguration Day is simply patently unfair. That, combined with the fact that 477 other defendants have already been sentenced to probation, more than half of whom have received higher sentencing recommendations from the government, the imposition of a term of incarceration on Mr. Kelly seems to be an obvious and easily-avoided sentencing disparity.

Furthermore, the issue of privilege rears its ugly head in this case when Mr. Kelly is compared to Mr. Trump and their respective parts in what happened on January 6, 2021. What Mr. Kelly did was wrong, but he was not the President of the United States. He did not have the attention of the media or the crowd on that day or any other day. He did not know the truth that Mr. Trump knew about the election results. He did not knowingly lie about election fraud or encourage anyone to go to the Capitol. He did not have the power to send resources to help law enforcement secure the area, nor was he in any position to implore the legions of Trump supporters to leave peacefully. Donald Trump, however, had all of those advantages. But most alarmingly is Mr. Trump's ability, following his election in November, to force the Special Counsel to come before this Court to announce his plans

9

to wind down his investigation and end any possibility of any punishment for his own actions before, during and after the January 6 attack on the Capitol. Counsel submits as an Officer of this Court that this is not how the rule of law should govern us, but given that this is the reality we face together we argue, respectfully, that if Mr. Trump faces no possibility of jail time despite having far more control over what happened on January 6, then Mr. Kelly should not go to jail either.

### Conclusion

When discussing the duty of a sentencing court to craft a just sentence, the Supreme Court has, in recent years, implored district court judges to craft sentences that reflect the objectives of §3553(a), basing those judgments on conduct that separates one offender from another and encouraging courts to grant policy-based variances that are not reviewable in order to achieve those aims. *See Kimbrough,* 552 U.S. 85 at 109 (2007), *Spears v. United States,* 555 U.S. 261 at 264 (2009), *Rita v. United States,* 551 U.S. 338 at 348 (2007). Examining those factors is thus the central focus of sentencing, and we respectfully assert that those factors favor probation over incarceration for Brian Kelly.

Mr. Kelly's conduct on January 6, 2021 was shameful. However, when compared to the other 1100 defendants sentenced, the nature and circumstances of his conduct place him squarely within the 200 least-culpable defendants. Furthermore, Mr. Kelly's long history of clean living suggests that this was an aberration, a series of actions on that day that are completely incongruent with his otherwise quiet and law-abiding life. The four years of clean living since his offense (and months of successful compliance with Pre-Trial Supervision following his arrest in 2024) suggests that the Court need not worry about him

breaking the law again. Brian Kelly is a man the Court will not see in the future, and his financial problems clearly leave him unable to pay a fine.

Perhaps the most important of the 3553(a) factors in Mr. Kelly's case is the need to avoid unwarranted sentencing disparities. The investigation and prosecution of cases stemming from the January 6, 2021 attack on the Capitol are *sui generis,* but with over 1100 cases sentenced so far we have a significant sample to compare to Mr. Kelly. The allegations outlined in the Plea Agreement, the Criminal Complaint and the Pre-Sentence Report and the government's suggestion of a 14-day sentence all prove that Mr. Kelly is among the 200 least-culpable charged offenders, and thus far approximately 477 of the 1100 defendants sentenced have not been sent to jail. Much like a sentencing enhancement or government sentencing argument that does not differentiate one offender from another based on their actual conduct and the empirical data and national experience of district court judges, the suggestion that Mr. Kelly deserves jail time simply does not differentiate him from others based on his conduct and is not supported by empirical data or the experience of other judges.

There are two other major sources of unwarranted disparities beyond the sentencing data available – the significant numbers of defendants whose cases have not yet been tried or sentenced, and the unknown number of offenders who will never be arrested. While Counsel does not believe that the Rule of Law is well-served by blanket pardons and ending the investigation and prosecution of January 6-related cases, our recent election makes that our new reality. Fundamental fairness demands that Mr. Kelly not be treated more harshly than these hundreds – or perhaps thousands – of other offenders who will face no punishment.

We ask the Court to impose a term of probation and the two $10.00 Special Assessments required by law, and order that Mr. Kelly pay the Architect of the Capitol $500.00 in restitution.

Should the Court decide that a brief jail sentence is appropriate, we ask that the Court consider the recommendations of the Probation Officer who prepared the Pre-Sentence Report and the Pre-Trial Services Officer who supervises Mr. Kelly and allow him to self-surrender.

Respectfully Submitted,

_____/S/_____
Gregory T. Hunter, Esquire
Virginia State Bar No. 45489
Counsel for the Defendant
2111 Wilson Boulevard
8th Floor
Arlington, Virginia 22201
(703) 966-7226 telephone
(703) 527-0810 facsimile
greghunter@mail.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of January, 2025 an exact copy of the foregoing Position of the Defense with Respect to Sentencing Factors was filed with the Clerk of the Court, causing a Notice of Electronic Filing to be sent to:

Melanie Krebs-Pilotti, Esquire
Assistant United States Attorney
450 5th Street NW
Suite 11008
Washington, DC 20530
(202) 307-0662 telephone
Melanie.Krebs-Pilotti2@usdoj.gov

Copies of this document have been forwarded to the following non-filing users:

By electronic mail:

Sean P. Buckley
United States Probation Officer
United States Probation Office for the District of New Hampshire
(603) 226-7313 telephone
Sean_Buckley@nhp.uscourts.gov

By personal service:

Brian Kelly
Defendant

                                                                   /S/
Gregory T. Hunter, Esquire
Virginia State Bar No. 45489
Counsel for the Defendant
2111 Wilson Boulevard
8th Floor
Arlington, Virginia 22201
(703) 966-7226 telephone
(703) 527-0810 facsimile
greghunter@mail.com